IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **HASANBOY OLIMOV**, *Petitioner*, v. **JAMAL JAMISON, Warden of Philadelphia Detention Facility, ET AL.**, *Respondents.* | Case No. 2:26-cv-00532-JDW |

## **MEMORANDUM**

Statutory interpretation is like a jigsaw puzzle: judges must try to fit various pieces of a statutory regime together in an effort to recreate an image that a creator (Congress) designed. For nearly 30 years, presidential administrations thought they had pieced together the puzzle that is the Immigration and Naturalization Act, at least when it comes to the provisions governing detention of those here without proper documentation. More recently, however, this administration has taken a different view. It says that the pieces fit together differently and require mandatory detention for people like Hasanboy Olimov, whose parole into the country expired before resolution of his asylum claim. If you squint, you can see why the Government now sees a different picture. But only if you squint. When I look closely at the INA, piece by piece, I conclude that the statute requires the Government to offer individuals who are already inside the country, like Mr. Olimov, a bond hearing

before detaining them. The Government didn't do that for Mr. Olimov, so I will grant him a petition for habeas corpus and order his release pending a bond hearing.

I.   **BACKGROUND**

   A.   **Mr. Olimov's detention**

On July 28, 2023, Mr. Olimov, a citizen of Uzbekistan, presented at a port of entry near Calexico, California. U.S. Customs and Border Protection ("CBP") designated him as an "arriving alien." (ECF No. 1-7.) CBP issued Mr. Olimov a "Notice To Appear" for "removal proceedings under section 240 of the Immigration and Nationality Act" before an immigration judge in Hartford, Connecticut, on July 28, 2025. At the same time, CBP issued an I-94 form to Mr. Olimov that paroled him into the country pending his removal proceedings. The form indicated that Mr. Olimov's parole would terminate on July 26, 2025.[1] CBP sent Mr. Olimov on his way, and he has been residing in the United States since then. By the terms of the I-94 form, Mr. Olimov's parole has terminated.

After his parole expired, the Government detained Mr. Olimov pending removal proceedings and brought him to the Federal Detention Center in Philadelphia.[2] However, soon after Mr. Olimov filed his habeas petition, the Government moved him to the Pike County Correctional Facility in the Middle District of Pennsylvania.

---

[1]   The I-94 form is not part of the record, but during the hearing on Mr. Olimov's habeas petition, his Counsel agreed that CBP issued this form and that Mr. Olimov's parole terminated in July 2025.
[2]   Neither Mr. Olimov's Petition nor the Government's response provides any factual detail concerning Mr. Olimov's most recent detention.

2

B.  **Procedural History**

On January 27, 2026, Mr. Olimov, via counsel, filed a Petition For Writ Of Habeas Corpus And Complaint For Declaratory And Injunctive Relief. He asserts that the Government violated the INA, its implementing regulations, the Due Process Clause of the United States Constitution, and the Administrative Procedure Act by detaining him without providing him a bond hearing. The following day, I ordered the Government to advise me whether it intended to oppose Mr. Olimov's Petition and, if so, whether it intended to make any arguments other than it made in a recent case before me: *Kashranov v. Jamison*, No. 25-cv-5555-JDW, 2025 WL 3188399 (E.D. Pa. Nov. 14, 2025). The Government filed its opposition to Mr. Olimov's Petition on February 6, 2026, and Mr. Olimov replied a week later. I held a hearing on February 23, 2026, and the Petition is ripe for review.

**II.    LEGAL STANDARD**

A federal district court is authorized to grant a writ of habeas corpus under 28 U.S.C. § 2241 where the petitioner is "in custody under or by color of the authority of the United States . . . in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. §§ 2241(c)(1), (3). The burden is on a petitioner to show that he is in custody in violation of the Constitution or federal law. 28 U.S.C. § 2241(c)(3); *Walker v. Johnston*, 312 U.S. 275, 286 (1941).

## III. ANALYSIS

This case is one of the hundreds that my judicial colleagues and I have reviewed over the past few months. Rather than repeat my prior analysis as to the jurisdictional and substantive arguments, I incorporate my memorandum from *Kashranov*, both as to jurisdiction and the proper interpretation of 8 U.S.C. § 1225(b)(2). *See Kashranov*, 2025 WL 3188399. However, intervening legal developments and new arguments from the Government necessitate additional discussion.

### A. Jurisdictional Issues[3]

Since I issued my decision in *Kashranov*, the Third Circuit clarified the scope of 8 U.S.C. § 1252(b)(9)—the INA's so-called "zipper-clause."[4] However, the Circuit's decision in *Khalil v. President, United States*, 164 F.4th 259 (3d Cir. 2026) does not alter my conclusion that I have jurisdiction to resolve Mr. Olimov's petition for habeas relief.

---

[3] The Government's relocation of Mr. Olimov from the Federal Detention Center in this District to the Pike County Correctional Facility in the Middle District of Pennsylvania does not divest this Court of jurisdiction over his petition because Mr. Olimov was still in this District when he filed it. *See Khalil v. President, United States*, 164 F.4th 259, 271 (3d Cir. 2026).

[4] The zipper clause provides: "Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this subchapter shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction, by habeas corpus under section 2241 of Title 28 or any other habeas corpus provision, by section 1361 or 1651 of such title, or by any other provision of law (statutory or nonstatutory), to review such an order or such questions of law or fact." 8 U.S.C. § 1252(b)(9).

As the Third Circuit recognized, in *Jennings v. Rodriguez*, 583 U.S. 281 (2018), a plurality of the Supreme Court "strongly suggested that § 1252(b)(9) would strip jurisdiction over claims with closer connections [to the Government's removal efforts], like 'challeng[es] [to] the decision to detain them in the first place or to seek removal,' challenges to 'any part of the process by which ... removability will be determined,' and requests to 'review ... an order of removal.'" *Khalil*, 164 F.4th at 277. But like the petitioner in *Kashranov*—and unlike the petitioner in *Khalil*—the detention-related questions that Mr. Olimov raises in his petition do not implicate the Government's decision to detain him in the first place or to seek his removal.⁵ Instead, he challenges the Government's interpretation of the statutory detention framework mandating his detention without a bond hearing. Thus, I may exercise jurisdiction over his petition, consistent with *Khalil*.⁶

---

⁵ In *Khalil*, the petitioner's arguments challenging his detention were "**identical** to his arguments against removal[,]" and his one detention-specific claim "just **repackage[d]** his challenges to his removal." *Khalil*, 164 F.4th at 276, 277 (emphasis added). Here, by contrast, Mr. Olimov is *not* challenging the Government's decision to initiate removal proceedings against him.

⁶ My colleagues have reached the same conclusion in similar cases challenging the Government's refusal to provide aliens with a bond hearing upon detaining them. *See, e.g.*, *Umarov v. Rose*, No. 26-cv-486, 2026 WL 445669, at *3 (E.D. Pa. Feb. 17, 2026); *Murodov v. Jamison*, No. 26-cv-594, 2026 WL 413440, at *1 (E.D. Pa. Feb. 13, 2026); *Alekseev v. Warden, Philadelphia Fed. Det. Ctr.*, No. 26-cv-462, 2026 WL 413439, at *2 (E.D. Pa. Feb. 13, 2026); *Vimos v. Fed. Det. Ctr. Philadelphia*, No. 26-cv-780, 2026 WL 381173, at *3 (E.D. Pa. Feb. 11, 2026); *Giyosov v. Jamison*, No. 26-cv-298, 2026 WL 209839, at *3-*4 (E.D. Pa. Jan. 27, 2026); *Rakhimov v. Jamison*, No. 26-cv-190, 2026 WL 206309, at *2 n.4 (E.D. Pa. Jan. 27, 2026); *Marcano v. Jamison*, No. 26-cv-239, 2026 WL 196504, at *2 (E.D. Pa. Jan. 26, 2026); *Mirdjalilov v. Warden of Fed. Det. Ctr. Philadelphia*, No. 25-cv-7068, 2026 WL 184249, at *4 (E.D. Pa. Jan. 23, 2026); *Kourouma v. Jamison*, No. CV 26-0182-KSM, 2026 WL 120208, at *3 (E.D. Pa. Jan. 15, 2026).

Finally, the Government's attempt to rewrite Mr. Olimov's petition can't divest the Court of jurisdiction. The INA precludes district court review of decisions by the Attorney General or Secretary of Homeland Security "the authority for which is specified under this subsection to be in [their] discretion." 8 U.S.C. § 1252(a)(2)(B)(ii). Even if the Attorney General's decision to revoke or terminate parole is discretionary,[7] it doesn't matter because Mr. Olimov is not challenging the decision to terminate or revoke his parole. He is challenging the Government's interpretation of the statutory framework that governs the requirement for a bond hearing while he is in custody. Thus, the Government's strawman argument about discretion does not preclude me from reviewing his petition.[8]

## B.     Bond Requirement

In *Kashranov*, I held that 8 U.S.C. § 1226(a), not 8 U.S.C. § 1225(b)(2), governs the detention of aliens[9] who are in the country because Section 1225(b)(2) only applies to aliens who are "seeking admission," which implies an element of physical transit. Since then, the Fifth Circuit has reached the opposite conclusion in *Buenrostro-Mendez v. Bondi*, 166 F.4th 494 (5th Cir. 2026), which the Government submitted to me by way of a notice of supplemental authority. In addition, the Government argues that even if I don't

---

[7]    *See, e.g.*, *Samirah v. O'Connell*, 335 F.3d 545, 549 (7th Cir. 2003).
[8]    The same reasoning applies to the Government's argument that the APA prevents me from reviewing Mr. Olimov's petition.
[9]    In other cases like this one, some of my colleagues refer to non-citizen petitioners like Mr. Olimov as "non-citizens." However, because the INA uses the term "alien," I will mirror the statutory language.

reconsider my decision in *Kashranov*, this case is unlike *Kashranov* because 8 U.S.C. § 1182(d)(5)(A) means that Mr. Olimov is seeking admission to the country, even though he's already here. I disagree with both arguments.

### 1.  *Buenorostro-Mendez*

The *Buenorostro-Mendez* decision does not persuade me to retreat from my prior conclusion that non-citizens like Mr. Olimov who have physically entered the United States are no longer seeking admission.[10] The Fifth Circuit's analysis flowed from its initial determination that because applying for something and seeking something both involve making a request, they must mean the same thing,[11] so any applicant for admission is necessarily seeking admission. *Buenrostro-Mendez*, 166 F.4th at 402. Yet the statutory

---

[10]   Numerous judges across the country have declined to follow *Buenrostro-Mendez*, including many of my colleagues here. *See, e.g.*, *Quintero Sanchez v. Rose*, No. 26-cv-1086, 2026 WL 509075, at *1 (E.D. Pa. Feb. 24, 2026); *Darispanashvili v. Rose*, No. 26-cv-1035, 2026 WL 497836, at *3 (E.D. Pa. Feb. 23, 2026); *Matute v. Jamison*, No. 25-cv-7093, 2026 WL 461557, at *3 n.3 (E.D. Pa. Feb. 18, 2026); *Traore v. Noem*, No. 26-cv-851, 2026 WL 446681, at *3 (E.D. Pa. Feb. 17, 2026); *Umarov*, 2026 WL 445669 at *5; *Alekseev*, 2026 WL 413439 at *4; *Murodov*, 2026 WL 413440 at *1 n.1; *Suarez v. Rose*, No. 26-cv-790, 2026 WL 383793, at *3 (E.D. Pa. Feb. 11, 2026); *Vimos*, 2026 WL 381173 at *5 n.12.

[11]   For example, the Court crafted a hypothetical about the college application process to support its conclusion that applying for admission and seeking admission are the same thing. But other hypothetical scenarios can illustrate a difference between applying for and seeking admission. For instance, an individual can be in the process of applying to become a member of a private social club that offers lodging and other amenities. While his application is pending, a friend may invite him to stay overnight as a guest. If the applicant refuses to leave the club the following day, he may still be an applicant for admission to the club as a member but he is no longer seeking admission into the club; he's already inside.

text refers to both a noun ("applicant for admission") and a verb ("seeking admission"), and as different parts of speech, these terms cannot be synonymous.

Having determined that the two terms are interchangeable, the majority in *Buenorostro-Mendez* brushed aside the concern that its interpretation would render the phrase "seeking admission" statutory surplusage; it dismissed the phrase as a mere "redundancy" that is "common in statutory drafting." *Id.* But even if such redundancies are common, courts have a duty to *avoid* surplusage, where possible, so that "no clause, sentence, or word shall be superfluous, void, or insignificant." *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001) (quotation omitted).[12]

While there is "no canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing[,]" *Buenrostro-Mendez*, 2026 WL 323330 at *5 (quotation omitted), that guidance has little use here, where Congress used *both* terms—"applicant for admission" and "seeking admission"—in the *same* statutory provision—Section 1225(b)(2)(A). *See Corley v. United States*, 556 U.S. 303, 315 (2009). This suggests more than "a simple mistake in draftsmanship" and indicates "that Congress used the distinct terms very deliberately." *Id.* (quotation omitted). The *Buenrostro-Mendez* decision also conflicts with the Supreme Court's observations in

---

[12]    "If a provision is susceptible of (1) a meaning that gives it an effect already achieved by another provision, or that deprives another provision of all independent effect, and (2) another meaning that leaves both provisions with some independent operation, the latter should be preferred." A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 176 (2012).

*Jennings* that Section § 1226 "applies to aliens already present in the United States." *Jennings*, 583 U.S. at 303. Though the Fifth Circuit discounted this statement as mere dicta, *Buenrostro-Mendez*, 2026 WL 323330 at *7, I "cannot lightly ignore [its] force ...." *Morrow v. Balaski*, 719 F.3d 160, 169 (3d Cir. 2013). Indeed, such dicta remains "highly persuasive." *Galli v. New Jersey Meadowlands Comm'n*, 490 F.3d 265, 274 (3d Cir. 2007).

In my view, my decision in *Kashranov* does a more thorough job than the panel in *Buenrostro-Mendez* of analyzing the statutory language of Section 1225(b)(2) to determine if the phrase "seeking admission" is a mere redundancy or has independent meaning. Unlike *Buenrostro-Mendez*, my decision looked at the definitions of the words "seek" and "admission," including reviewing the definitions section of the INA. After conducting that analysis, I determined that the words in the statute have independent meaning, and I construed them that way. The decision in *Buenrostro-Mendez* did none of that before deciding to dismiss the statutory phrase as surplusage. Thus, nothing in the *Buenrostro-Mendez* decision causes me to revisit my decision in *Kashranov*.

### 2. Section 1182(d)(5)(A)

Even if I continue to apply my construction of Section 1225(b)(2) from *Kashranov*, the Government contends that Mr. Olimov is seeking admission based on its interpretation of 1182(d)(5)(A), which would make detention under Section 1225(b)(2) appropriate. Section 1182(d)(5)(A) grants the Secretary of Homeland Security the discretion to release aliens who, like Mr. Olimov, arrive at a port of entry on parole "for

urgent humanitarian reasons or significant public benefit ...." 8 U.S.C. § 1182(d)(5)(A). Yet, "such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall ... have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States." *Id.* The Government contends that the reference to "return[ing] to custody" means that the alien is once again "seeking admission," just as he was when he arrived at the port of entry, so he is subject to detention under Section 1225(b)(2). The Government's argument assumes that "return ... to custody" means a return to detention at the moment before parole, but it provides no analysis to support that interpretation.

My analysis begins as it must—with the statutory text. *See Sebelius v. Cloer*, 569 U.S. 369, 376 (2013). While the statute specifies a return to "custody," it does not define the word "custody." So, I'm left to interpret the term, with a goal of giving effect to Congress's intent. *See Hagans v. Comm'r of Soc. Sec.*, 694 F.3d 287, 295 (3d Cir. 2012). As a threshold matter, "nothing in th[e] text [of Section 1182(d)(5)(A)] affirmatively authorizes detention" of an alien like Mr. Olimov. *Clark v. Martinez*, 543 U.S. 371, 385 (2005); *see also Qasemi v. Francis*, No. 25-cv-10029, 2025 WL 3654098, at *10 (S.D.N.Y. Dec. 17, 2025). Instead, the plain language of the statute "says that two things happen to a noncitizen following expiration of parole: (1) he 'shall forthwith return or be returned to the custody from which he was paroled'; and (2) 'thereafter his case shall continue to be dealt with in

the same manner as that of any other applicant for admission to the United States.'" *Qasemi*, 2025 WL 3654098 at *10 (quotation omitted).

When Congress does not define a term, a court may consider dictionary definitions to ascertain the term's meaning, focusing on the term's meaning when Congress enacted the statute. *Tanzin v. Tanvir*, 592 U.S. 43, 48-49 (2020). When Congress enacted the Immigration and Nationality Act of 1952, it included identical language about a return to custody following parole. *See* Pub.L. 82-414, 66 Stat. 163, 188, § 212(d)(5) (June 27, 1952).[13] Then, as now, the statute did not define "custody." However, at the time Congress enacted the INA, "custody" could refer to charge, control, or possession, as well as detention. *See* Custody, Black's Law Dictionary, 460 (4th ed. 1951). Indeed, the term was "very elastic and [could] mean actual imprisonment or physical detention or mere power, legal or physical, of imprisoning or of taking manual possession." *Id.* One way to distinguish the type of custody at issue is by looking for accompanying prepositions such as "in" and "into" or a modifier like "physical." *See Qasemi*, 2025 WL 3654098 at *10. For example, the term custody "imports actual imprisonment" in a sentence providing that "the defendant 'be *in* custody until'" a certain time. Custody, Black's Law Dictionary at 460

---

[13]   The statute is available at https://www.govtrack.us/congress/bills/82/hr5678/text.

(emphasis added).[14] Absent the use of similar signals in Section 1182, I cannot conclude that a return to custody refers to physical custody.[15]

In addition, other provisions within Section 1182 refer to custody, and the context makes clear that the term does not refer to physical confinement or detention. Where a court within the United States has "granted custody" over a minor child to a guardian, an alien who refuses to turn over the minor child pursuant to the custody order is deemed inadmissible. *See, e.g.*, 8 U.S.C. §§ 1182(a)(10)(C)(i), (ii)(III). The context makes clear that "custody" refers to the guardian's legal authority or control, rather than physical confinement. Nothing in Section 1182 suggests that Congress intended the term "custody" to mean one thing in Section 1182(a)(10)(C) and then something different in Section 1182(d)(5)(A).

Other provisions in the INA support this interpretation, too. For example, the INA uses the terms "detain," "detained," and "detention." *See, e.g.*, 8 U.S.C. §§ 1225(b)(2)(A), (b)(3), (d)(2)(A). Congress used those terms in the 1952 version of the statute as well, at the same time that it used the word "custody" in Section 1182. *See, e.g.*, Pub.L. 82-414, 66 Stat. at 199, § 235(b); *id.* at 210, § 242(c). These words all demonstrate an intent for the Government to take an alien into physical custody. *See Jennings*, 583 U.S. at 307

---

[14] This is true for more modern usage of the term as well. *See Qasemi*, 2025 WL 3654098 at *10.

[15] For example, Section 1182(d)(5)(A) stands in stark contrast to the mandatory detention provision in Section 1226(c) which requires the Attorney General to "take *into* custody" aliens with criminal histories. 8 U.S.C. § 1226(c)(1) (emphasis added).

(construing the term "detain" to refer to the act of confining or restraining a person); *Qasemi*, 2025 WL 3654098 at *10 n.5 (reasoning that "detention is physical custody, or custody with an element of actual confinement"). Congress's use of the various forms of the word "detain" demonstrates that, in 1952, when Congress wanted to specify physical custody, it knew the words to use. *See Bittner v. United States*, 598 U.S. 85, 94 (2023); *Russello v. U.S.*, 464 U.S. 16, 23 (1983).

Even Section 1182 itself distinguishes between detention and custody by describing an inadmissible alien as one "who detains or retains [a] child, *or* withholds custody of the child[.]" 8 U.S.C. § 1182(a)(10)(C)(i) (emphasis added). Congress's use of the terms "detains" and "withholds custody" in the disjunctive demonstrates that it intended for custody to mean something different than detention. Because Congress used both terms in the same statutory provision, I will "not presume to ascribe this difference to a simple mistake in draftsmanship." *Corley*, 556 U.S. at 315 (quotation omitted). Instead, this demonstrates that "Congress used the distinct terms very deliberately." *Id.*

As a general matter, "there is no 'canon of interpretation that forbids interpreting different words used in different parts of the same statute to mean roughly the same thing.'" *Jennings*, 583 U.S. at 303 (quotation omitted). But in this instance, where "custody" is an elastic term that could have various meanings, it is more prudent to assume that Congress meant custody to refer to control over the alien, as opposed to physical detention. *See United States ex rel. Petratos v. Genentech Inc.*, 855 F.3d 481, 488 (3d Cir.

13

2017) ("The use of different words or terms within a statute demonstrates that Congress intended to convey a different meaning for those words.").

Even if one could construe Section 1182's reference to "custody" as referring to physical detention, my reading of the statute is a better one because it comports with the canon of constitutional avoidance, a "'cardinal principle' of statutory interpretation[.]" *Zadvydas v. Davis*, 533 U.S. 678, 689 (2001). "[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent." *Id.* at 693. Yet the Government's interpretation of Section 1182, if correct, raises serious constitutional concerns because it would mean that aliens who physically entered the United States on parole would be subject to mandatory detention without the opportunity for a bond hearing once their parole has ended. But that violates due process. *See Kashranov*, 2025 WL 3188399 at *5. "When a statute is susceptible of two constructions, by one of which grave and doubtful constitutional questions arise and by the other of which such questions are avoided, [my] duty is to adopt the latter." *Gonzalez v. United States*, 553 U.S. 242, 251 (2008) (cleaned up). Thus, I decline to adopt the Government's interpretation of Section 1182 as mandating detention without a bond hearing.

My reading of the statute also comports with the longstanding canon against absurdity, which requires me to avoid a statutory interpretation that "would produce absurd results ...." *Griffin v. Oceanic Contractors, Inc.*, 458 U.S. 564, 575 (1982). As the

Government acknowledged during the hearing on Mr. Olimov's petition, its construction would leave aliens who present at a port of entry and are granted parole in a *worse* position than aliens who cross the border without permission and evade detection for many years. Indeed, the latter would be entitled to a bond hearing upon detention, whereas parolees like Mr. Olimov would not. I cannot see how adopting an interpretation that incentivizes illegal border-crossing is consistent with any statutory purpose. Given all this, I agree with the other district judges who have analyzed the text of the statute and reached the same conclusion that Section 1182's reference to "custody" does not authorize mandatory detention under Section 1225.[16]

## IV.   CONCLUSION

"[W]hen [the Government] affirmatively chose to release [Mr. Olimov] on parole, it made the decision that he would no longer be subject to the mandatory detention" under Section 1225(b). *Qasemi*, 2025 WL 3654098 at *9. Once Mr. Olimov's parole ended, the Government had to handle his case "in the same manner as that of any other applicant for admission to the United States." 8 U.S.C. § 1182(d)(5)(A). Because Mr. Olimov was no longer seeking admission into the United States at that time—as he had been residing within the country for two years—the INA required the Government to provide him with

---

[16]   *See Ruiz v. Trump*, No. 26-cv-12, 2026 WL 323254, at *6 (D. Vt. Feb. 6, 2026); *Medrano-Rocha v. Santacruz*, No. 26-cv-404, --- F.Supp.3d ----, 2026 WL 411355, at *5 (C.D. Cal. Jan. 23, 2026); *Qasemi*, 2025 WL 3654098 at *10. *But see Coal. for Humane Immigrant Rts. v. Noem*, 805 F. Supp. 3d 48, 85 (D.D.C. 2025) (equating "custody" with "immigration detention" with no corresponding analysis of the term).

a pre-deprivation bond hearing before it detained him. See Kashranov, 2025 WL 3188399 at *6-*7. It failed to do so, and Mr. Olimov is entitled to habeas relief. An appropriate Order follows.

**BY THE COURT:**

*/s/ Joshua D. Wolson*
JOSHUA D. WOLSON, J.

March 3, 2026